1  ANGEL GOMEZ, State Bar No. 74476
   RHEA G. MARIANO, State Bar No. 204469
2  J. SUSAN GRAHAM, State Bar No. 128123
   EPSTEIN BECKER & GREEN, P.C.
3  1925 Century Park East, Suite 500
   Los Angeles, California 90067-2506
4  Telephone: 310.556.8861
   Facsimile: 310.553.2165
5  agomez@ebglaw.com
   rmariano@ebglaw.com
6

7  Attorneys for Defendant
   U.S. TELEPACIFIC CORP., a California
8  corporation dba TelePacific Communications,
   erroneously sued as U.S. TelePacific
9  Corporation dba TelePacific Communications

10

11              **UNITED STATES DISTRICT COURT**

12        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

13

| 14 | FREDERICK E. STEMME, | CASE NO. CV10-1069 JAK (RZx) |
|---|---|---|
| 15 | Plaintiff, | [Assigned to Hon. John A. Kronstadt] |
| 16 | v. | |
| 17 | U.S. TELEPACIFIC CORPORATION DBA TelePacific Communications, and | **SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN** |
| 18 | DOES 1 through 30, inclusive, | **SUPPORT OF DEFENDANT U.S. TELEPACIFIC CORP.'S MOTION** |
| 19 | Defendants. | **FOR PARTIAL SUMMARY JUDGMENT** |
| 20 | | |
| 21 | | Hearing Date:    June 20, 2011 |
| 22 | | Hearing Time:   1:30 p.m. Courtroom:      750 (Roybal) |
| 23 | | |
| 24 | | Complaint Filed: 1/10/10 Discovery Cut-Off: 5/13/11 |
| 25 | | Final Pretrial Conference: 7/18/11 Trial Date: 7/26/11 |

26

27      In accordance with Local Rule 56-1, Defendant U.S. TELEPACIFIC

28  CORP., a California corporation dba TelePacific Communications ("Defendant" or

"USTP"), submits the following Proposed Statement of Uncontroverted Facts and Conclusions of Law in support of its Motion for Partial Summary Judgment against Plaintiff FREDERICK STEMME ("Plaintiff").  PLEASE NOTE that all deposition citations referenced herein are attached to the Declaration of Angel Gomez submitted herewith.

## PLAINTIFF'S FIRST CLAIM FOR RELIEF FOR VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT ("FMLA") FAILS

Issue No. 1:  The First Claim for Violation of FMLA – Interference fails as a matter of law because the undisputed facts establish that USTP did not establish a new intermittent FMLA leave policy that violated the law.

Issue No. 2:  The First Claim for Violation of FMLA – Interference fails as a matter of law because the undisputed facts establish that USTP's alleged new intermittent FMLA leave policy, established on or about January 3, 2008, did not interfere with, restrain, or deny Plaintiff the exercise of FMLA leave.

In support of these issues, Defendant relies on the following uncontroverted facts:

## I. GENERAL FACTS REGARDING USTP'S BUSINESS OPERATIONS AND PLAINTIFF'S EMPLOYMENT

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
| --- | --- |
| 1.    Defendant USTP is a telecommunications company that provides both hardware and software for its customers' internal and external telephone calls and internet access. | Declaration of Gregory Haines ("Haines Dec."), ¶ 2. |
| 2.    As part of its business operations, including in 2007 and 2008, USTP | Haines Dec. ¶ 2; Declaration of Durell Montenegro ("Montenegro Dec."), ¶ 1. |

- 2 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| maintained a Customer Technical Support Center ("CTSC") in Los Angeles in order to respond to customer inquiries regarding problems with their phone and internet systems. | |
| 3.      In 2007 and 2008, the CTSC staffed four groups of employees - - "Screener," "Assigner," "Tier 1 Technician," and "Tier 2 Technician" - - in order to provide trouble-shooting for USTP's customers.  Screeners took down basic information from a customer during an initial phone call, created a work order assignment (called a "ticket") for the new assignment, informed the customer that they would be called back by a Technician, and placed the ticket in a queue.  An Assigner (a sub-group within the general Screener group) then distributed the tickets to Technicians on a rotation basis.  For customers who were calling on an existing ticket and who needed to speak with a Technician immediately, the Screener would call the Technician who had been originally assigned the ticket to connect them | Haines Dec. ¶ 4. |

- 3 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| directly with the customer.  If that original Technician was not available at that moment, the Screener would then call other Technicians who were available right then to speak with that customer.  Screeners had computer technology available to them that showed which Technicians were not on the phone already and who therefore were able to assist the customer immediately. | |
| 4.     In 2007 and 2008, Technicians were the individuals who worked on solving the customer's problem including by accessing USTP internal trouble-shooting computer systems and speaking with the customer on the telephone. There were two classes of Technicians. Tier 1 (or T1) Technicians were expected to resolve almost all basic to medium-level problems that customers presented. Tier 2 (or T2) Technicians handled more difficult problems. | Haines Dec. ¶ 5. |
| 5.     USTP expected Technicians to solve customer problems for a variety of hardware and software platforms that USTP offered and to actively work up to | Haines Dec. ¶ 6. |

- 4 -

Separate Statement in Support of Motion for Summary Judgment
Case No. CV10-1069 JAK (RZx)

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 15 - 20 tickets at any one time.  As an example of the process, Tier I Technicians could speak with a customer to get a detailed report about the issues the customer was facing and if the problem could not be solved readily, would then research potential causes and solutions (such as by calling outside providers).  The Technician would then call back the customer to discuss potential solutions and test the solutions. This problem-solving process could take anywhere from less than one hour to several hours or days, until the problem was resolved to a customer's satisfaction. More difficult problems were transferred to a Tier 2 Technician to resolve. | |
| 6.      Tier 1 Technicians worked exclusively by phone in the CTSC call center.  They did not go to customers' business locations to resolve the service problems. | Declaration of Haines, ¶7. |
| 7.      Plaintiff commenced temporary employment with USTP on September 12, 2005 and permanent employment on December 1, 2005.  Plaintiff resigned | Complaint, p. 3, ¶ 8; Declaration of Nordquist, ¶ 4. |

- 5 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| his employment with Defendant on May 19, 2008. | |
| 8.     During most of his employment with USTP, Plaintiff acted as a Tier I Technician. | Haines Dec. ¶ 6. |
| 9.     Vincent Pereda, Thomas Carter and Durell Montenegro, respectively, acted as Plaintiff's supervisors in the CTSC for various periods of time from 2006 through May 19, 2008. | Haines Dec. ¶ 9; Montenegro Dec. ¶ 2; Carter Depo., pp.141:19-142:17; Plaintiff Depo., pp. 138:3-10; 193:25-194:4; 264:22-265:1. |
| 10.     USTP distributed to all employees, including Plaintiff, a copy of its "Core Values" and Code of Ethics. | Nordquist Dec. ¶ 6. |
| 11.     At USTP it was standard procedure that employees requesting a leave of absence were required to obtain from their treating physician a Certification by Health Care Provider. | Nordquist Dec. ¶ 7. |

II. PLAINTIFF'S JOB PERFORMANCE

- Deficient Knowledge of Products and Inability to Maintain Workload

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 12.     In Plaintiff's 2005 Annual Merit Review (Section 1: Core Competencies ONLY), more than 50% of the specific categories of his job performance were | Nordquist Dec., ¶5, Exh. 3 (2005 Annual Merit Review) |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| evaluated as "needs improvement." | |
| 13.    During Plaintiff's employment with USTP, its business underwent a significant technological change.  The old, existing technology was known as "T-1 based technology" and the newer was known as "integrated technology".  One of the USTP brand names for equipment based on the newer type of technology was "Arrival" (the name of a company that USTP had recently acquired. | Haines Dec. ¶ 8. |
| 14.    Plaintiff and other USTP Technicians had a background in the older "T-1-based technology."  In 2006, all Technicians were expected to learn the new integrated technology and USTP provided the same training and opportunities for all Technicians to acquire this knowledge. | Haines Dec. ¶ 8. |
| 15.    In March 2006, Plaintiff advised USTP that he did not have adequate knowledge or skills regarding the "data" aspects of his job and requested more training.  USTP management attempted | Nordquist Dec. Exh. 4 (3/27/06 Email from Plaintiff to Greg Haines, et al. and 3/27/06 response thereto). |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| to encourage Plaintiff by stating in writing:  "You can learn it Fred, don't give up before trying" and advising him don't "sell yourself short."  Management also reminded Plaintiff that he had knowledge regarding a number of related concepts and that he should seek out assistance from his fellow Data technicians, including some who sat right next to him and behind him at work. | |
| 16.    In April 2006, Plaintiff complained to USTP that he was not able to handle his workload and that he did not have sufficient training to perform his job properly.  He sought to transfer out of the CTSC.   USTP advised him that due to staffing needs in the CTSC, it would not immediately agree to a transfer but that a transfer would be considered in the future. | Nordquist Dec. Exh. 5 (4/4/06 Email from Pereda to Haines)  Plaintiff Depo., pp. 141:18-142:3. |
| 17.    In July 2006, Plaintiff had training on Arrival network and told USTP that it "was very helpful." | Nordquist Dec. Exh. 6. |
| 18.    In December 2006, after returning from a 2-month personal leave of absence, USTP management decided to | Nordquist Dec. Exh. 7  (12/18/06 Email from Carter to Ashworth: USTC 00125 – USTC 00126.) |

- 8 -

Separate Statement in Support of Motion for Summary Judgment
Case No. CV10-1069 JAK (RZx)

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| ease Plaintiff's return to work by having him start on non-Arrival tickets and simple issues. | Carter Depo. 14:23-125:7 |
| 19.    In Plaintiff's 2006 Annual Merit Review, Plaintiff received mostly "needs improvement" and "satisfactory" marks, and overall Core Competency and Metrics grades at just 72% and 74% respectively. | Nordquist Dec. Exh. 8 |
| 20.    In February 2007, Plaintiff wrote to management about the high number of assignments he had received in a short period. | Nordquist Dec. Exh. 12 (2/5/07 Email from Plaintiff to Carter, Ashworth, et al.: USTC 000886 – USTC 000887). |
| 21.    In March 2007, Plaintiff wrote to management about the high number of "tickets" he had been assigned and in May 2007, he complained about the volume of his workload again, having received 3 "tickets" within 30 minutes. Management investigated Plaintiff's May 2007 complaint; determined that everyone else had the same amount of assignments that day; and communicated this fact to Plaintiff. | Nordquist Dec. Exh. 13 (3/12/07 Email from Plaintiff to Ashworth and Haines: USTC 00135); Exh. 22 (5/18/07 Email from Plaintiff to Carter and response thereto:  USTC  00138). |
| 22.    In or about July 2007, Plaintiff was sent to Las Vegas, Nevada to receive | Nordquist Dec. Exh. 27 (USTC 00240 – USTC 00243); Haines Dec. ¶ 12. |

- 9 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| training on the Arrival network which consisted of 3 days learning the system and about 1½ days working Arrival assignments.  Plaintiff thought the training was "great" but still considered himself unprepared to work Arrival assignments. He requested that he be sent to Stockton, California for an entire week of additional training.  No other Tier 1 Technician was given the additional extensive training Plaintiff had requested and USTP denied his request and instructed him to seek assistance from his fellow Technicians in the Los Angeles office. | |
| 23.    In August 2007, Plaintiff informed USTP that he felt the volume of his workload was high and that it was very stressful for him to try to learn the Arrival network on what he considered to be "limited training."  Plaintiff requested USTP not give him Arrival assignments and he again sought more training on data-based networks.  USTP management responded that it was unable to provide additional Arrival | Haines Dec. ¶ 13; Nordquist Dec. Exh. 27 (USTC 00240 – USTC 00243). |

- 10 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| training at that time and suggested Plaintiff work with his fellow Technicians in order to gain more experience. | |
| 24.   On September 17, 2007, Plaintiff wrote his supervisor that he had a "very high workload" and asked for assistance with an Arrival assignment because he could not handle his workload and at the same time "learn" the Arrival network. | Montenegro Dec. ¶ 7; Nordquist Dec. Exh. 30 (9/17/07 Email from Plaintiff: USTC 001167). |
| 25.   On November 26, 2007, Plaintiff stated to his supervisor, Durell Montenegro, that he is "not trained on the Arrival network" and he requested additional training.  He also stated he felt "overwhelmed with tickets [assignments]" and described the CTSC as getting "some pretty complicated repair tickets and an extremely heavy work load."  On November 29, 2007, Plaintiff requested that he not be assigned any Arrival tickets and that he be given more training on Arrival. USTP agreed to remove him from Arrival assignments and Gregory Haines, CTSC's Senior Director, stated | Haines Dec. ¶ 14; Nordquist Dec. Exhs. 38 and 39 (11/26/07 and 11/29/07 Emails from Plaintiff; 11/29/07 Email from Haines:  USTC 001312A – B; USTC 00673 – USTC 00675). |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| he would work on a new training schedule for Plaintiff. | |
| 26.    On November 30, 2007, Plaintiff's former supervisor and current CTSC Voice Escalations manager, Thomas Carter, opined to Mr. Haines that Plaintiff's request to be taken off of Arrival tickets because he had just returned from a leave of absence was "BS."  In Mr. Carter's opinion, as communicated to USTP management, Plaintiff has "been trying to get out of Arrival tickets since he went to training. He doesn't want to work them." | Haines Dec. ¶ 14; Nordquist Dec. Exh. 40  (11/30/07 Email from Carter to Haines; USTC 001315 – USTC 001320); Carter Depo.:  103:13-105:9 |
| 27.    In Plaintiff's 2007 Annual Merit Review, Plaintiff received mostly "unsatisfactory" and "satisfactory" marks, and overall Core Competency and Metrics grades at just 72% and 68% respectively. | Nordquist Dec. Exh. 42 |
| 28.    On January 3, 2008, Plaintiff sought advice from his supervisor, Durell Montenegro, in order to service a "Smartvoice Circuit" issue.  Mr. Montenegro gave direction to Plaintiff where to find the answer.  Plaintiff was | Montenegro Dec. ¶ 23; Haines Dec. ¶ 15; Nordquist Dec. Exh. 45 (USTC 1514-17) |

- 12 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| not able to resolve the issue despite this instruction and asked Mr. Montenegro for "more training."  Mr. Montenegro reminded Plaintiff that all the Technicians, including Plaintiff, previously had been trained on the subject. | |
| 29.    Based on Plaintiff's request for more training and his inability to follow Mr. Montenegro's instructions on how to resolve the customer's problem, Mr. Montenegro perceived that Plaintiff did not know how to adequately service Smartvoice Circuit products and made the decision to take him off of these type of assignments until he received further training.  Mr. Montenegro was concerned about having to limit Plaintiff's assignments and the negative impact it could have upon the efficient operation of the call center. | Montenegro Dec. ¶ 23; Nordquist Dec. Exh. 45 (USTC 1514-17) |
| 30.    Mr. Montenegro communicated to his manager the need to cut back on Plaintiff's assignments because he was not knowledgeable on certain USTP products and the need for him to get | Montenegro Dec. ¶¶ 23, 24; Haines Dec. ¶15; Nordquist Dec. Exh. 45 (USTC 1514-17) |

- 13 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| further training. Mr. Haines responded, "This is BS he did the same thing with the Arrival training."  Mr. Haines then instructed that Plaintiff be moved to a full time Screener position "ASAP." | |

- Problems Interacting with Screeners and Failure to Follow USTP Policies and Procedures

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 31.    In April 2006, USTP received a complaint from a Screener, Tiffany Carter, about Plaintiff being "very rude" and that his conduct had resulted in customers' phone calls being disconnected.  USTP had received prior complaints about Plaintiff resisting Screeners' calls in the past. | Nordquist Dec. Exh. 5 ( 4/3/06 Email from Tiffany Carter to Lynn Ashworth; 4/4/06 Email from Lynn Ashworth to Vincent Pereda.); |
| 32.    In January 2007, Plaintiff was instructed several times via email that he was not to refuse calls from screeners "for any reason." | Nordquist Dec. Exh. 9 (January 30, 2007 Email from Thomas Carter to Plaintiff and other USTP technicians: "Team, yesterday we refused a total of 6 refused calls from one screener. We are not to refuse calls for any reason. The screeners have been instructed to keep logs of testers refusing calls, and the reason they state for refusal. . . . It |

- 14 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| | has previously been stated that you are not to refuse a call for any reason"); and Exh. 10 (Second January 30, 2007 from Carter to Plaintiff); Haines Dec. ¶10. |
| 33.    Plaintiff expressed his disagreement with management's policy and stated he had "no choice" but to refuse calls from Screeners because of his workload.  In response, Plaintiff's supervisor once again instructed him that he must never refuse calls from screeners. | Nordquist Dec. Exh. 10 (January 30, 2007 email from Plaintiff to Carter stating he has "no choice to refuse calls" from screeners due to his workload; January 30, 2007 email from Carter to Plaintiff again admonishing that "the policy is that the techs are not to refuse calls. All of the techs have been notified to inform a member of management if they are falling behind in their workloads. When a technician notifies us of this situation, we are able to assist their workload enough for them to not refuse calls."); Haines Dec. ¶10. |
| 34.    In February 2007, USTP management informed Plaintiff not to communicate directly with screeners or the assigners, who "don't need the added stress of trying to appease individual technicians.  If you have a problem with | Nordquist Dec. Exh. 12 (2/5/07 Email from Carter to Stemme) |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| ticket assignment or your workload, please advise a member of management." | |
| 35.    Just one month after being instructed not to contact screeners or assigners and instead communicate with managers regarding problems, Plaintiff violated the instruction and called a screener/assigner to complain about having been assigned a "trouble ticket" that Plaintiff believed should have gone to a different technician. | Nordquist Dec. Exh. 16 (3/20/07 Email from Plaintiff to Ashworth and Carter) |
| 36.    Ms. Ashworth informed Plaintiff's supervisor that she was not impressed with Plaintiff and that she wanted him "written up" because of his violation of an explicit instruction not to speak with the assigners.  Mr. Carter responded that Plaintiff needed "a reality check" because he was ignoring the comments from management in his latest review regarding "emails" and he disregarded the express instruction not to contact screeners and assigners. | Nordquist Dec. Exh. 16 (3/20/07 Email from Plaintiff to Ashworth and Carter) |
| 37.    On September 14, 2007, Plaintiff's supervisor, Mr. Montenegro, received a written complaint that Plaintiff had | Nordquist Dec. Exh. 29; Montenegro Dec., ¶6. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| refused to take a call from a Screener, which the CTSC manager, Lynn Ashworth, characterized as "horrible customer service" for which Plaintiff should be "written up." | |
| 38.    On September 17, 2007, Mr. Montenegro received yet another complaint about Plaintiff.  The Screener who complained stated that Plaintiff had just come back from lunch, had refused to take a call, and had hung up on the Screener.  Ms. Ashworth expressed in writing her frustration with Plaintiff's attitude and instructed Mr. Montenegro to issue to Plaintiff a Level 1Employee Counseling Report ("ECR"), the lowest-level warning in USTP's employee discipline system, which Mr. Montenegro did. | Montenegro Dec. ¶ 8; Nordquist Dec. ¶ 6, Exh. 31. |
| 39.    After the ECR was issued to Plaintiff, USTP reminded Plaintiff that refusing calls would not be "tolerated by anyone on the floor." | Montenegro Dec. ¶ 9; Nordquist Dec. Exh. 32 |
| 40.    Plaintiff appealed the September 2007 ECR to Ms. Ashworth and tried to excuse his conduct by stating he was not | Nordquist Dec. Exh. 33 |

- 17 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| in attendance at a recent meeting during which the Technicians were reminded, yet again, not to refuse calls. | |
| 41.    In her September 2007 replies to Plaintiff, Ms. Ashworth stated:  "It has always been the policy of CTSC for testers to accept calls from screeners" and that it was "not a new process" or "something that came up in last week's team meeting. The policy and expectation have always been in place." Plaintiff continued to protest and stated it was unfair that he did not receive a prior warning about his conduct.  Ms. Ashworth pointed out that Plaintiff previously had been reprimanded for refusing to accept calls; that this behavior had been documented; and that she stood by the decision to issue the Level I ECR. | Nordquist Dec. Exh. 33  (September 19, 2007 Email from Ashworth to Plaintiff) |
| 42.    Before September 2007, USTP had informed Plaintiff multiple times that he must not refuse calls from customers or Screeners. | Haines Dec. ¶ 10. |
| 43.    In May 2007, USTP management perceived Plaintiff as having a poor attitude and as improperly questioning | Nordquist Dec. Exh. 19 (5/2/07 Email from Trigueros to Carter and Ashworth) |

Separate Statement in Support of Motion for Summary Judgment
Case No. CV10-1069 JAK (RZx)

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| management's decisions. | ("This is getting out of hand. He's [Plaintiff's] practically questioning management at this time.") |

- Plaintiff's Outburst in Late December 2007

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 44.    On December 20, 2007, several people in CTSC heard Plaintiff stated in a loud voice in the CTSC, "I will not take another fucking call."  At least three people confirmed Plaintiff having made this statement in a loud voice including a Senior Vice-President, Mike James and Gary Ottosi, a CTSC manager (both of whom were only a few feet from Plaintiff) and Plaintiff's supervisor, Durell Montenegro. | Montenegro Dec. ¶ 12. |
| 45.    Plaintiff admits that he made the statement, or words to that effect; that it was inappropriate for him to have said this; that he "takes full responsibility"; and that he was aware others in the call center had heard him make the statement. | Nordquist Dec. Exh. 48 (1/8/08 Response of Plaintiff to Employee Counseling Report); Plaintiff Depo., pp. Vol. II, pp. 288:18-290:15. |
| 46.    In USTP manager Ottasi's opinion, which he communicated to | Montenegro Dec. ¶ 14; Nordquist Dec. ¶ 5 and Exhs. 1, 2 and 46 (1/3/08 Email |

- 19 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| other managers, this outburst by Plaintiff violated USTP's code of conduct and represented insubordination because Plaintiff threatened not to take any more calls when taking such calls was a fundamental part of his job. | from Ottasi to Montenegro, Haines, Carter and James; Code of Ethics; "Core Values") |
| 47.      USTP had distributed to Plaintiff and all employees a copy of its "Core Values" and Code of Ethics. | Nordquist Dec. ¶ 12 and Exhs. 1 and 2. |
| 48.      Plaintiff's supervisor, Durell Montenegro, thought that the December 20, 2007 incident involving Plaintiff particularly embarrassing because a senior level executive was present when Plaintiff made his statement, so that it reflected poorly upon the management of the CTSC, and he also was concerned that customers could overhear him. | Montenegro Dec. ¶ 12. |
| 49.      Durell Montenegro did not report the December 20, 2007 incident to his managers until January 3, 2011 because of the intervening holiday period and because CTSC was short-staffed during that time. | Montenegro Dec. ¶ 13. |
| 50.      On or about January 3, 2008, Mr. Carter announced that he would prepare | Montenegro Dec. ¶ 14; Nordquist Dec. Exh. 46  (1/3/08 Email from Carter) |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| a Level III ECR on Plaintiff as his conduct was "not acceptable." Plaintiff's supervisor, Durell Montenegro, agreed with the decision to issue a Level III ECR for Plaintiff's behavior because he considered it to be serious misconduct and insubordination. | |
| 51.    USTP would not have imposed a Level III ECR if Plaintiff had simply used profanity, which some other employees also had used in the CTSC.  It did so because of the context of the December 20, 2007 incident involving Plaintiff, in which he used profanity loudly in front of a senior executive and with the possibility that customers could over him, and he did so in conjunction with stating that he was refusing to take any more calls. | Haines Dec. ¶ 17; Montenegro Dec. ¶¶12, 13; Nordquist Dec. Exh. 52. |
| 52.    USTP's ECR system was not "progressive" meaning that an employee could receive a Level III ECR without first being given a lower level ECR or a warning to improve behavior. This was communicated to Plaintiff during his employment with USTP. | Nordquist Dec. Exh. 52 (4/8/08 Email from Lalita Nordquist to Plaintiff) |

- 21 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 53.     Plaintiff was not the only USTP to have been disciplined for use of profanity in the CTSC. | Haines Dec. ¶ 18; Nordquist Dec. Exh. 34 (USTC 003116). |
| 54.     The January 7, 2008 Level III ECR made clear that Plaintiff was not receiving any cut in salary, benefits or seniority with the company and that upon completion of certain training, Plaintiff would be eligible to return to the Technician position. | Haines Dec. ¶19; Nordquist Dec. Exh. 47 |
| 55.     On January 3, 2008,  Mr. Haines instructed Plaintiff be moved to a full time Screener position in response to being informed that Plaintiff was having difficulty servicing certain types of products and was requesting more training.  Mr. Haines believed that Plaintiff could not handle the heavy workload and demands of a Technician position and that serving as a Screener could provide him more time to undertake training. | Nordquist Dec. Exh. 45 |
| 56.     The decision to implement a Reduction-in-Force that would eliminate Screener positions was not made until April 2008. | Haines Dec. ¶ 16. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 57.   In November 2007, another Tier I Technician received an Employee Counseling Report ("ECR") for refusing 2 calls from screeners during that month and in October 2007, an employee received a Level III ECR for refusing customer calls and using inappropriate language. | Nordquist Dec. Exh. 34 (USTC 003116) |

- Plaintiff's Problems Continue In His New Role As Screener in 2008

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 58.   In January 2008, Plaintiff started working as a Screener. | Plaintiff Depo 247:1-18; Nordquist Dec. Exh. 45 (1/3/08 Haines email to Montenegro). |
| 59.   In his capacity as a Screener, USTP received complaints about Plaintiff having a poor attitude and failing to start his work promptly. | Nordquist Dec. Exh. 50 (1/28/08 Email from Jennifer Knight to Lynn Ashworth). |

PLAINTIFF'S NUMEROUS ABSENCES FROM WORK

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 60.   Plaintiff was absent from work for a 2-month period, from approximately October 18, 2006 to December 18, 2006.  USTP granted Plaintiff's request for a personal leave of | Nordquist Dec. ¶ 8. |

- 23 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| absence for this time period.  This leave was not taken under the FMLA. | |
| 61.    In March 2007, Plaintiff notified USTP that he needed to take "intermittent leave" under the FMLA for the purpose of caring for an elderly parent who had a chronic medical condition.  Again, USTP granted Plaintiff's request.  The FMLA leave for care of the parent was from April 23, 2007 to April, 23, 2008. | Nordquist Dec. ¶ 9; Exhs. 14, 15 and 18. |
| 62.    Plaintiff submitted to USTP an FMLA Certificate of Health Care Provider signed by his parent's physician on April 23, 2007.  The Certificate states that the patient will need care on an intermittent basis 7 days a week but that "the patient may not need help on a daily basis depending on her condition."  Plaintiff also requested FMLA leave to care for his parent from May  2008 to May 2009. | Nordquist Dec. ¶ 14, Exhs.18, 56 and 57 (4/07 FMLA Certificate, May 12, 2008 Email Exchanges; 5/08 FMLA Certificate); Declaration of Gomez, Plaintiff's deposition, pp.232:17-234:7. |
| 63.    USTP explained to Plaintiff that under FMLA/CFRA he was entitled to 12 work weeks of unpaid leave in a rolling backward 12-month period, and | Nordquist Dec.¶11, Exhs. 14,15 and 20. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| on March 20, 2007, Plaintiff signed an Employee Acknowledgement regarding his rights and responsibilities that reflected this policy.  In addition, on May 2, 2007, Plaintiff sent an email to Lynn Ashworth in which he acknowledged that he was aware he had "12 weeks of time of work as needed to care for a family member with a serious and permanent health condition." | |
| 64.    Commencing in May 2007 to the end of his employment in May 2008, Plaintiff began missing work or being late for work almost every single month pursuant to this intermittent FMLA leave; his own FMLA leave; and for illnesses and other reasons that were unrelated to the FMLA leaves.  Several times, Plaintiff did not give any advance notice that he would not be coming into the office or that he would be late for work.  Instead, he often called USTP on the same day that he was scheduled to work to advise he was going to be absent or that he was going to be late. | Nordquist Dec. Exh. 60. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 65.    For almost a 2-month period, from September 24, 2007 to November 18, 2007, Plaintiff was absent from work as part of the FMLA intermittent leave to care for his parent as well as a concurrent FMLA leave for himself during a portion of this time. | Nordquist Dec. ¶ 13. |
| 66.    Plaintiff notified USTP, while he was absent from work on FMLA leave to care for his parent, that he had injured himself in the process of caring for his parent.  Plaintiff requested, and USTP granted to him, a new FMLA leave for his own medical condition. Plaintiff submitted a Certification from his Health Care Provider for FMLA leave from October 26, 2007 to November 19, 2007.  Thus, there was a period of time that Plaintiff had two concurrently running FMLA leaves. | Nordquist Dec. ¶13. Exhs. 34. |
| 67.    Plaintiff returned to work on November 19, 2007 from the nearly 2-month leave of absence, but then was absent again the next day, November 20, 2007, which he stated was FMLA-related as well. | Nordquist Dec. Exhs. 34. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 68.    Upon Plaintiff's return from his second 2-month leave of absence, USTP accommodated him by giving him a reduced workload and providing more training to him, including regarding the Arrival product. | Nordquist Dec. Exh. 38 and 39 |
| 69.    USTP perceived a pattern was developing where Plaintiff would take FMLA time off to protest being disciplined. | Nordquist Dec. ¶12. |

USTP COMMUNICATIONS RE FMLA POLICY INCLUDING
VERIFICATION THAT ABSENCE FROM WORK IS FMLA-RELATED

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 70.    In March 2007, Karen Hallsman emailed Plaintiff in conjunction with his request for FMLA information.  She encouraged Plaintiff to get FMLA medical certification completed and also advised him to "just bring a doctor's note for absences **when possible** (medical appts. etc.), and request any time off as much in advance as possible."  (Emphasid added) | Nordquist Dec.¶ 10, Exh. 17 (March 26, 2007 Email from Karen Hallsman to Plaintiff) |
| 71.    In May 2007, Karen Hallsman confirmed in writing an oral communication with Plaintiff that "**as** | Nordquist Dec. ¶11, Exh. 21 (May 3, 2007 Email from Hallsman to Haines, Ashworth and Simmons) |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| **much as possible**, time missed should be noted with a doctor's note of some kind."  She also noted there "**there may be times when this is not possible as Fred may just need to stay home with his mother, etc.**, but in those cases, he should notify management (preferably with an e-mail or in writing) so it's documented as to why the time off is being taken, and we can apply toward his FMLA calendar." | |
| 72.    Plaintiff acknowledged his understanding of the FMLA policy that Ms. Hallsman had explained in March and May 2007, and that a doctor's note was not required for all FMLA leave, but instead if some type of verification such as a receipt could be obtained, including from a pharmacy, that he should bring it in. | Plaintiff Depo., pp. 237:17-238:11. |
| 73.    USTP experienced some difficulty keeping track of Plaintiff's absences that were attributable to the FMLA leave to care for his mother; the FMLA leave for his own medical conditions; and the absences of Plaintiff that were not FMLA | Nordquist Dec. ¶¶ 10, 14-16, and Exhs. 41 and 49 (12/10/07-12/11/07 emails and 1/8/08 email) |

- 28 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| related.  USTP also needed to ensure that it could effectively operate its call center and have sufficient staff to promptly respond to customer calls during Plaintiff's absences, particularly when Plaintiff provided no advance notice that he would not be coming to work. | |
| 74.    In December 2007, USTP communicated to Plaintiff the need for his assistance in ensuring USTP has appropriate coverage in the CTSC so that it could "maintain a vibrant workflow by keeping us in the loop concerning your FMLA needs" and helping USTP accurately track the FMLA-related absences.  USTP advised Plaintiff it wanted to work with him coordinating his FMLA needs and believed it had done so in the past.  On December 10, 2007, Plaintiff responded to these communications stating, "I agree that the support has been wonderful." | Nordquist Dec. ¶15, Exh. 41 (12/10/07-12/11/07 emails) |
| 75.    USTP and Plaintiff engaged in a series of communications in December 2007 regarding what documentation and verification would be necessary to | Nordquist Dec. ¶15, Exh. 41 (12/10/07-12/11/07 emails) |

- 29 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| establish that absences from work were related to the approved FMLA condition. | |
| 76.     On December 10, 2007, Thomas Carter wrote Plaintiff and advised that "moving forward you will need to submit a doctor's note for all FMLA time used. Prescription pickups need to be scheduled outside of working hours unless in an emergency situation." Plaintiff wrote to USTP's Human Resources dept. and questioned whether he had to comply with this policy, given that not all FMLA leave was related to doctor's visits and he already had submitted a certificate from his mother's physician regarding her medical condition. | Nordquist Dec. ¶15, Exh. 41 (12/10/07-12/11/07 emails) |
| 77.     Maureen Simmons, the Regional Manager of Human Resources, acknowledged that Plaintiff previously had provided a medical certification when initially requesting the FMLA certified that his family member had a serious illness for which medical care was necessary.  "It was not meant to say you did not need to provide any | Nordquist Dec. ¶15-17, Exh. 41 (12/10/07-12/11/07 emails) |

- 30 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| additional information if requested.  If you are off for reasons related to your FMLA you may be requested to bring a doctor's note to accompany the certification we have on file.  Unfortunately, the certifications we have on file for you and your mother are not clear as to the amount of time you will need off. Therefore, we will need you to assist us in certifying that the time you are taking off is indeed related to the FMLA." | |
| 78.   On December 10, 2007, Ms. Simmons requested Plaintiff's input regarding what type of documentation he could bring for FMLA leave that did not involve a doctor's visit.  She asked him to bring in a doctor's note only when he was off for FMLA **AND** going to a doctor's visit.  "You and I have talked before and I know that you are not always going to the doctor's office for your mother, but we really do need to verify that the time off is for FMLA. What can you bring to assist us with verifying this?" | Nordquist Dec. ¶15, Exh. 41 (12/10/07-12/11/07 emails) |

- 31 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 79.     In further response to Plaintiff's inquiries about confusion generated by the apparent conflict between his managers' directive that he needed a doctor's note for all FMLA leave and the human resources department's directive that he did not need a doctor's note unless he was visiting a doctor, Deana Arutyunyan of Human Resources apologized for the confusion and informed Plaintiff in writing: "**Whenever possible**, please try to assist by bringing in Dr. notes **and/or receipts** to show you were out purchasing medicine or other necessary items related to your mom's condition."  (Emphases added) | Nordquist Dec. ¶16, Exh. 41 (12/10/07-12/11/07 emails) |
| 80.     Plaintiff agreed that he would "bring in receipts whenever applicable" and Ms. Simmons expressed her gratitude that he was "working with us to find solutions to manage your FMLA. I am not suggesting that you bring information that is not relevant to us, such as prescription medicine information. However, I would ask that | Nordquist Dec. ¶¶16, 17, Exh. 41 (12/10/07-12/11/07 emails) |

Separate Statement in Support of Motion for Summary Judgment
Case No. CV10-1069 JAK (RZx)

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| you continue to try to keep these types of appointments outside your normal shift whenever possible. I understand this may not always be the case, but as you know, it is vital that management understands how to coordinate their day when an employee is out. As stated in the previous emails continue to provide a doctors note when you or your mother is treated by the physician. It is not necessary to disclose why you were treated, just that you were treated. This would serve to be a great help in tracking the FMLA since you are taking it intermittently for both you and your mother." | |
| 81.    In the December 2007 exchanges of emails with Plaintiff regarding verification for FMLA, it was clear that USTP was using the term "doctor's notes" as shorthand meaning that Plaintiff should submit some kind of verification to show his absence was FMLA-related and that "doctor's notes' and "notes" could include a pharmacy receipt if the circumstances at issue involved, for example, a visit to a | Haines Dec. ¶ 20; Nordquist Dec. ¶15-17,  Exh. 41 (12/10/07-12/11/07 emails); Carter Depo., p. 52:1-23. |

Separate Statement in Support of Motion for Summary Judgment
Case No. CV10-1069 JAK (RZx)

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| pharmacy instead of a physician's office. | |
| 82.    On January 2, 2008, Plaintiff called his supervisor, Durell Montenegro, and stated that he would not be into work as scheduled in the morning but instead would be coming in late with an estimated arrival time in the afternoon. | Montenegro Dec. ¶ 17. |
| 83.    Mr. Montenegro informed Greg Haines about Plaintiff not coming into work until the afternoon and Mr. Haines inquired whether this was FMLA-related and stated that, if so, Plaintiff "will need a doctor's note to return to work."  At the time Mr. Haines sent his email, Mr. Montenegro had not told him why Plaintiff was running late (i.e., because he was going to the pharmacy). | Montenegro Dec. ¶17; Haines Dec. ¶20; Nordquist Dec. Exh. 43 |
| 84.    On January 2, 2008, Mr. Montenegro informed Plaintiff that Mr. Haines was requiring Plaintiff bring a doctor's note to come back to work. Plaintiff responded that would bring back a receipt from the pharmacy. | Montenegro Dec. ¶ 17. |
| 85.    Upon his return to work on January 2, 2008, Plaintiff handed Mr. | Montenegro Dec. ¶ 17; Nordquist Dec., Exh. 44; Plaintiff Depo., pp. 266:7- |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| Montenegro a pharmacy receipt and Mr. Montenegro said "okay," or words to that effect, and advised Plaintiff that he would check with Mr. Haines to see if a receipt was okay. | 267:19. |
| 86.    Mr. Montenegro submitted the pharmacy receipt to Human Resources and received an email from Ms. Arutyunyan that the receipt should be sufficient. | Montenegro Dec. ¶ 17; Nordquist Dec. Exh. 44 |
| 87.    As of January 2008 and continuing through the end of Plaintiff's employment, Ms. Arutyunyan was the sole manager of his FMLA intermittent leave of absence and was responsible for communicating with Plaintiff and management regarding any questions arising out of his FMLA leave and keeping track of the amount of time off of work that Plaintiff took and that was attributable to the FMLA leave. | Arutyunyan Dec., ¶ 3. |
| 88.    Ms. Arutyunyan's standard practice in advising USTP employees who were on intermittent FMLA leave that they should bring in a doctor's note "when feasible" for absences, such as | Arutyunyan Dec. ¶ 5. |

- 35 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| when visiting a doctor anyway for an appointment. | |
| 89.    Mr. Montenegro did not tell Plaintiff when he turned in the receipt on January 2, 2008 that it was not acceptable or that he could not return to work unless he brought a doctor's note.  USTP permitted Plaintiff to return to work on January 2, 2008.  Plaintiff never brought any doctor's note for his January 2, 2008 absence from work. | Montenegro Dec. ¶ 17; Nordquist Dec. Exh. 44 |
| 90.    Plaintiff was never turned away from work due to a failure to bring a doctor's note. | Montenegro Dec. ¶ 17 |
| 91.    On March 3, 2008, Plaintiff took FMLA leave and did not present any doctor's note.  He was still allowed to return to work. | Haines Dec.¶ 21; Nordquist Exh. 51. |
| 92.    On March 25, 2008, Plaintiff took FMLA leave and upon returning the next day, presented a doctor's note merely stating that he was on FMLA leave from April 2007 to April 2008.  USTP accepted this and he was permitted to return to work. | Haines Dec.¶ 21. Nordquist Exh. 59. |

- 36 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 93.     Plaintiff never received anything in writing from USTP at any time in 2008 (the year he states the "new" FMLA leave policy commenced) stating that a doctor's note was required for all FMLA leave regardless of the purpose of the absence, such as to provide home care or to pick up a prescription from the pharmacy. | Nordquist Dec. Exhs. 63. |
| 94.     USTP never told Plaintiff that he must take his parent to the doctor to get a doctor's note every time he was on FMLA-related leave for non-doctor's visits. | Plaintiff Depo., pp. 237:23-240:23; Haines Dec. ¶ 22. |
| 95.     During Plaintiff's employment, he repeatedly wrote multiple emails questioning and challenging department and company policies. | Nordquist Dec. Exhs. 62. |
| 96.     Although Plaintiff engaged in lengthy email communications with USTP regarding policies impacting FMLA leave, he did not write even one email to USTP in January, February, or March 2008 regarding the alleged "new" FMLA leave policy requiring doctor's notes for all FMLA-related leave. | Nordquist Dec. Exh. 58 and 61. |

- 37 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 97.   In a May 2008 interview of Plaintiff by Ms. Arutyunyan, she explained to Plaintiff that recertification by a health care provider of the FMLA intermittent leave was not necessary and she explained the difference between a certification and a doctor's note that helped USTA verify that a particular absence was FMLA-related.  At the end of this formal interview Plaintiff reviewed the notes that had been taken, and he agreed that the notes accurately captured what had been said. | Arutyunyan Dec. ¶¶ 4, 5; Nordquist Dec., Exh. 54 [Notes of the meeting] |

**PLAINTIFF'S SECOND CLAIM FOR RELIEF, FOR VIOLATION OF THE FMLA BASED UPON RETALIATION FAILS**

Issue No. 3:  The Second Claim for Violation of FMLA – Retaliation fails as a matter of law because the undisputed facts establish that Plaintiff was not subjected to any adverse employment action after his purported opposition to USTP's alleged new intermittent FMLA leave policy.

Issue No. 4:  The Second Claim for Violation of FMLA – Retaliation fails as a matter of law because, assuming *arguendo*, that Plaintiff was subjected to any adverse employment actions, the undisputed facts establish that any such adverse employment action was based on non-retaliatory reasons.

In support of these issues, Defendant relies on the following uncontroverted facts:

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|

| | |
|---|---|
| 98.    USTP incorporates by reference as if set forth herein verbatim Undisputed Fact Nos.1 through 97 above, as well as the evidence cited in support thereof. | |
| 99.    Plaintiff contends USTP issued a Level III Employee Counseling Report ("ECR") in retaliation for Plaintiff opposing USTP's "new" FMLA policy effective January 2, 2008 (which allegedly required submission of a doctor's note for all FMLA-related leave of any kind) and that USTP "singled him out" for more severe disciplinary action than others because he had opposed the new policy. | Complaint, ¶ 36; Plaintiff's Depo., pp. 266:6-267:19. |
| 100.   Plaintiff did not lodge any objection to the alleged "new" January 2008 FMLA policy until March, 2008 at the earliest. | Plaintiff Depo., pp.263:6-267:19; Nordquist Dec. Exh. 52 |
| 101.   Plaintiff did not complain or otherwise oppose any policy of USTP requiring doctor's notes for FMLA-related absences on January 2, 2008, the day he was told to bring a doctor's note. | Montenegro Dec. ¶ 17. |

Separate Statement in Support of Motion for Summary Judgment
Case No. CV10-1069 JAK (RZx)

# PLAINTIFF'S FOURTH CLAIM FOR RELIEF FOR VIOLATION OF THE AMERICAN WITH DISABILITIES ACT ("ADA") FAILS

<u>Issue No. 5</u>:  The Fourth Claim for Violation of the ADA fails as a matter of law because the undisputed facts establish that USTP did not subject Plaintiff to any adverse employment action because his parent had a disability.

<u>Issue No. 6</u>:  The Fourth Claim for Violation of the ADA fails as a matter of law because, assuming *arguendo*, that Plaintiff was subjected to any adverse employment actions, the undisputed facts establish that any such adverse employment action was based on non-discriminatory reasons.

In support of these issues, Defendant relies on the following uncontroverted facts:

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 102.    USTP incorporates by reference as if set forth herein verbatim Undisputed Fact Nos. 1 through 101 above, as well as the evidence cited in support thereof. | |
| 103.   USTP never instructed Plaintiff that he had to take his mother to the doctor to secure doctor's notes for his FMLA-leave. | Nordquist Dec. Exh. 41 |
| 104.    USTP's disciplinary action against Plaintiff was not motivated because his parent was disabled or any desire to discriminate against his parent. | Montenegro Dec. ¶¶12-15; Haines Dec. ¶¶15-19; Nordquist Dec. Exh. 47 (Level III ECR) |

- 40 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## PLAINTIFF'S FIFTH CLAIM FOR RELIEF, FOR WRONGFUL
## TERMINATION IN VIOLATION OF PUBLIC POLICY FAILS

Issue No. 7:  The Fifth Claim for Wrongful Discharge in Violation of Public Policy fails as a matter of law because the undisputed facts establish that Plaintiff was not discharged, but voluntarily resigned.

Issue No. 8:  The Fifth Claim for Wrongful Discharge in Violation of Public Policy fails as a matter of law because the undisputed facts establish that Plaintiff's working conditions were not sufficiently "intolerable" to constitute constructive termination.  (*Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1246-1247, 32 Cal.Rptr. 2d 223 (1994).)

Issue No. 9:  The Fifth Claim for Wrongful Discharge in Violation of Public Policy fails as a matter of law because the undisputed facts establish that Plaintiff had reasonable alternatives to quitting his employment.

Issue No. 10:  The Fifth Claim for Wrongful Discharge in Violation of Public Policy fails as a matter of law because the undisputed facts establish that USTP did not create the alleged intolerable conditions.

Issue No. 11:  The Fifth Claim for Wrongful Discharge in Violation of Public Policy fails as a matter of law because the undisputed facts establish that USTP did not knowingly permit the alleged intolerable working conditions to persist.

Issue No. 12:  The Fifth Claim for Wrongful Discharge in Violation of Public Policy fails as a matter of law because the undisputed facts establish that USTP was not aware that Plaintiff found his working conditions to be so intolerable that a reasonable employee in Plaintiff's position would have felt compelled to resign.

Issue No. 13:  The Fifth Claim for Wrongful Discharge in Violation of

Public Policy fails as a matter of law because, assuming, *arguendo*, that Plaintiff can establish that he was constructively discharged, the undisputed facts establish that his employment termination did not violate a fundamental public policy.

Issue No. 14:  The Fifth Claim for Wrongful Discharge in Violation of Public Policy fails as a matter of law because, assuming, *arguendo*, that Plaintiff can establish that he was constructively discharged, the undisputed facts establish that there is no causal nexus between his purported complaint about USTP's alleged new intermittent FMLA leave policy and his alleged constructive discharge.

In support of these issues, Defendant relies on the following uncontroverted facts:

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
| --- | --- |
| 105.    USTP incorporates by reference as if set forth herein verbatim Undisputed Fact Nos. 1 through 104 above, as well as the evidence cited in support thereof. | |
| 106.   In April and May 2008, Plaintiff exchanged various emails with Human Resources in which he first contended he was the subject of "discrimination" and "retaliation" based upon his FMLA-leave status. | Nordquist Dec. Exh. 52 |
| 107.   USTP investigated Plaintiff's claim, including interviewing Plaintiff and a number of other employees, including Plaintiff's supervisor. | Nordquist Dec. ¶¶19-22; Exhs. 63 [notes of interviews with the employees]; Arutyunyan Dec. ¶¶ 4, 5. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 108.   During the course of the investigation, USTP's Human Resources manager requested Plaintiff collaborate with her instead of being competitive.  She asked Plaintiff to "work with" her to "find a resolution.  No more lengthy emails . . . simple . . . straight up communication that will help me to identify your needs/wants and help me to engage your management in solution finding please."  Human Resources' Lalita Nordquist made clear to Plaintiff during her investigation of his discrimination and retaliation charges that her goal was to get the Plaintiff "back into [his] old position under new management" and to find out what Plaintiff wanted in order for the parties to have a "win win" situation in the end.  There is no responsive email from Plaintiff after this invitation to communication with her advising that he wanted the FMLA policy changed. | Nordquist Dec. 19-21; Exh. 52. |
| 109.   During its investigation into Plaintiff's contention of discrimination in conjunction with his FMLA leave | Nordquist Dec. Exh. 52. |

- 43 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| status, USTP communicated to Plaintiff that it had decided to appoint a different supervisor for Plaintiff, with no knowledge of Plaintiff's disciplinary record; to restore Plaintiff to his position of Technician at an earlier time in order to avoid the Reduction-in-Force that would otherwise eliminate Screener positions and potentially cause Plaintiff to lose his job; and that it would secure more training for Plaintiff. | |
| 110.   On May 19, 2008, about a month AFTER USTP communicated its decision set forth in Undisputed Fact no. 100, Plaintiff left a voicemail indicating that he quit his job without any advance notice. | Nordquist Dec. Exh. 64: USTC 3496 (voicemail from Plaintiff resigning his position); Montenegro Dec. ¶¶ 16-17. |
| 111.   Had Plaintiff not been on FMLA-leave status, USTP would have terminated his employment because of its perception that he was unable to acquire the skills needed to service the new Data-based technology based upon the same amount of training given other Technicians and because Plaintiff repeatedly violated company policy. | Haines Dec. ¶ 17. |

- 44 -

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 112.   Plaintiff contends that the only reason he quit his job was because of USTP's alleged "new" FMLA policy effective January 2008. | Plaintiff Depo., pp. 312:24-313:19; 328:12-329:4. |
| 113.   Plaintiff interviewed for a job at another company 2 months before he quit USTP. | Nordquist Dec. Exh. 65. |

## PROPOSED CONCLUSIONS OF LAW

1.   The First Claim for Violation of the Family and Medical Leave Act ("FMLA") – Interference fails as a matter of law because the undisputed facts establish that:

    a.   USTP did not establish a new intermittent FMLA leave policy that violated the law.

    b.   USTP's alleged new intermittent FMLA leave policy, established on or about January 3, 2008, did not interfere with, restrain, or deny Plaintiff the exercise of FMLA leave.

2.   The Second Claim for Violation of FMLA – Retaliation fails as a matter of law because the undisputed facts establish that:

    a.   Plaintiff was not subjected to any adverse employment action after his opposition to USTP's alleged new intermittent FMLA leave policy.

    b.   Assuming *arguendo*, that Plaintiff was subjected to any adverse employment actions, any such adverse employment action was based on non-retaliatory reasons.

- 45 -

3.   The Fourth Claim for Violation of the American with Disabilities Act ("ADA") fails as a matter of law because the undisputed facts establish that:

   a.   USTP did not subject Plaintiff to any adverse employment action because his parent had a disability.

   b.   Asuming *arguendo*, that Plaintiff was subjected to any adverse employment actions, any such adverse employment action was based on non-discriminatory reasons.

4.   The Fifth Claim for Wrongful Discharge in Violation of Public Policy fails as a matter of law because the undisputed facts establish that:

   a.   Plaintiff was not discharged; he resigned.

   b.   Plaintiff's working conditions were not sufficiently "intolerable" to constitute constructive termination.

   c.   Plaintiff had reasonable alternatives to quitting his employment.

   d.   Assuming, *arguendo*, that Plaintiff's working conditions were sufficiently "intolerable," USTP did not create the alleged "intolerable" working conditions.

   e.   Assuming, *arguendo*, that Plaintiff's working conditions were sufficiently "intolerable," USTP did not knowingly permit the alleged "intolerable" working conditions to persist.

   f.   USTP was not aware that Plaintiff found his working conditions to be so intolerable that a reasonable employee in Plaintiff's position would have felt compelled to resign.

   g.   Plaintiff's employment termination did not violate a fundamental public policy.

   h.   There is no causal nexus between Plaintiff's purported complaint about USTP's alleged new intermittent FMLA leave policy and his alleged constructive discharge.

- 46 -

5.     Plaintiff is not entitled to lost wages after May 19, 2008 because he voluntarily resigned from his employment with USTP.

6.     Plaintiff is not entitled to emotional distress damages on his First and Second Claims for Relief based upon violation of FMLA because the statute does not permit recovery of such damages.

DATED:  May 20, 2011                      EPSTEIN BECKER & GREEN, P.C.


By: /s/  Angel Gomez
      Angel Gomez
      Rhea G. Mariano
      J. Susan Graham
      Attorneys for Defendant
      U.S. TELEPACIFIC CORP., a
      California corporation dba
      TelePacific Communications,
      erroneously sued as U.S.
      TelePacific  Corporation dba
      TelePacific Communications